And our final case this morning is Kimberly Barnes-Staples v. Murphy. Speaking of the GSA. Right. Come on up. I was going to say my client knows the answer probably. Not me. May it please the court. You may proceed. Ruth Major on behalf of the appellant. The issue in this case is very simply the method by which the real estate director position was filled in this case. What we've looked at and we've brought to the court is an argument very similar to the argument in front of this court in Christie v. Foremost. Which is where we're not asking the court to make a determination on who's more qualified here. We're saying that the GSA violated their own policies, disregarded their own policies in fact and procedures. And did a number of other things that were inconsistent with how they normally do things in connection with promotional considerations. And that conduct was sufficient to create inferences from which a jury could say we believe this was a discriminatory process. In each and every case the lower court came up with sort of an explanation. It inferred, drew inferences completely opposite of my client in favor of the moving party. And I just want to go through a few of these. One important point I want to make to start is that these guidelines do apply to the decision that's at issue in this case. There's been some argument by the GSA that it doesn't apply here. There's no documentation or support. If you look at the procedures it says it applies to hiring decisions and these types of employment decisions. And what is in front of this court is the absolute decision as to who would get the job. And that would be the time it should apply. It's most important, not the time where it's least important to follow these procedures. These procedures were developed and it says right there in the guidelines. They were developed to eliminate or reduce the chances of discrimination in these types of employment decisions. And it's a voluminous document that lays out all the things that the GSA should have been doing in this situation. I looked at the appellee's brief last night and noticed that at one point they say that Green, who was organizing this process, the second step, that he didn't know about the procedure. And that's absolutely false. They all knew about it. At docket number 76-4, page 35 in his deposition, Green is asked about it and he says, yes, I knew about this and I've been trained on it for 10 years. And HR even gave him a copy at the time of the second step. So all of these decision makers knew about this procedure. But they all intentionally disregarded very important parts. One of the most important parts was that they were supposed to come up with some questions for everybody, same questions, they did that. But even more important is they were supposed to come up with what the answer should be. What's a 5? You know, what are we looking for for a 5? What are we looking for for a 4? And there's even examples in the guidelines. They completely failed to do that. They were supposed to each individually rate the candidates after they finished the interviews. They didn't do that. They were supposed to discuss and come to a consensus. They didn't do that. There's a dispute. Two said that Ms. Acevedo agreed to the decision to promote Woodstock. Ms. Acevedo claimed she never gave any opinion on it. There was no. They were also supposed to consider under the procedure the whole picture of the candidate. Of course, that makes sense. What is their educational background? What is their work history? What are their performance reviews? What accomplishments do they have? The testimony in this case was that the decision was made after the interviews based on the interviews and that it took 10 minutes. There was no discussion. It was just we think Woodstock's answers were the best to the interview questions based on our subjective assessment and we're going to give the job to Woodstock. That is not consistent with what the procedures dictate. They also asked a very job specific question of the candidates that favored Ms. Woodstock. Ms. Woodstock was working in the real estate division and there was a very nuanced question that she would know from working there. Again, the procedures say those type and things that people can learn on the job should not be asked about. It should be questions that any candidate inside or outside knowledgeable about the exact work that's going on or not knowledgeable could answer equally. But didn't that question go to an issue that the real estate director position that the person whoever it was who would be hired in that position would be expected to address? It just happens that Ms. Woodstock has prior experience in the real estate department but the position for which GSA was interviewing for was someone in the real estate department that has to address those types of issues. Right, but according to the procedures, questions are supposed to be geared to determine whether the person has the competency, the knowledge, the skill set to handle those issues. Not whether they have specific knowledge that only somebody currently working in the department would know at the time. And that's where the issue comes in. Because then it's not a level playing field. Because if you're asking something, and they all admitted that Cheryl Woodstock would know that because she was working in the department. Well, it's kind of like, say hypothetically speaking, a school is interviewing for a math teacher position. And they have two interviewees. One was a former math teacher and the other one was a former history teacher. And so they asked both candidates, well, do you know algebra? Because algebra is something that whoever gets this position will have to teach. And do you think that question is unfair? No. I think if they said, what do you think we should do about some of the specific students that have been struggling with algebra? That's where the problem would come in. Because it's not something that people inside or outside could answer based on their general knowledge. It's a department specific question that gives the upper hand to somebody who's actually worked in the department recently. And that's the problem here. And the procedures caution against asking about things that you can learn on the job. So a general algebra question absolutely would be appropriate. But a question specific to that school, to that department, that only people working there would be able to answer gives the upper hand to the candidate who actually, and in this case it was a softball for Cheryl Woodstock. And that's what it was. It was a softball question for Cheryl Woodstock. And something people outside wouldn't be able to answer because they don't have that departmental knowledge. Which is just specific to what's going on at the time. Ms. Major, do you think they were giving softball questions to Candidate Roberto? I don't know offhand what Candidate Roberto's knowledge was of this specific issue. Because this was something that Cheryl Woodstock had been involved in. But I can't speak to Roberto. I can speak to my client and Ms. Woodstock. And it was something my client would not be able to do. Well, I'm just trying to look at the relevant scores. And your client comes in third, as I understand. Through this process, yes. Through this process, which we believe is from start to finish, well at least with the second step, was tainted. So yeah, I mean, it's very hard to talk. This whole process from the beginning to the end, as it concerns this final step. Almost every, well I'll say half of the aspects, steps that they were supposed to go through and cover, they didn't. If they've asked the softball question of Ms. Woodstock, that's inappropriate under your suggested, what has occurred here. So you throw out everything that all the, is that a situation of almost harmless error? I mean, does one softball question give the big difference in the number scoring here? Well, it's one aspect of this, the totality, which we talk about in our, you know, support talks about in our teas, it's one aspect. I'm not saying that that alone would be it. More importantly here, in my opinion, is the fact that they didn't have the answers, the rating scale established, which created complete subjectivity. They didn't consider, you know, that my client had an MBA. We never said, and I saw this in their brief, we never said she should get the job because she has an MBA. But that should be a consideration. You know, a graduate degree, everybody on the panel had an MBA. They hire from MBA panels. This is one more, there's just a number of these, and we've listed them in, where they just disregarded their normal procedures, and essentially set it up so that one person would stand out among the rest, and that was Cheryl Woodstock. So, I don't know if I have any time to answer your questions. Actually you don't, I'll give you a little time. Okay, thank you so much. Thank you. Mr. Lindland. Please, the court, counsel. What she's really complaining about here is she wanted the director's job. That's the top job, the head of a division, of a division where she hasn't worked in about 10 years. Now, the person who got the job, Ms. Woodstock, had been there for 18 years, the last 10 of which she was in a manager's position. In fact, right before this promotion, Ms. Woodstock was the acting deputy director. So, it's not that surprising that someone like Ms. Woodstock would get this position over someone like the plaintiff who hasn't worked in the division for 10 years. I mean, it's like, let's say a restaurant's hiring for their head chef in the kitchen, and they have a choice between a person who's worked in the kitchen for 18 years and is managing all the sous chefs, they're like the top sous chef manager, versus someone like the plaintiff who is working in the accounting department for the restaurant or managing some of the wait staff. It wouldn't be surprising to hire the top sous chef that's been there for 18 years. So, what they're trying to do now is pick apart the process, find any little tiny technicality or detail that the GSA didn't follow, and then point to that and say that's discrimination. But as the district court correctly found, that's not how it works. You can't just take a few little detailed deviations and say, oh, that's a systemic and blatant deviation from a hiring policy. Can we talk about the applicability of the guidelines to the second round interviews? As I understand GSA's position, the guidelines do not apply to that second round. And I was wondering if you'd be so kind as to point me to a document that simply states that. Because the Gelber directive does not. That would be docket 80-6, exhibit 34, which is the unrebutted declaration of Ms. Bocanero. She's the HR specialist assigned to this specific promotion. And as she testified, the guidelines did not apply to the second round because they used them in the first round. And then she talks in detail about why that's true. You know, they argue that there's no foundation for this testimony. But in fact, that's her job. Her job is to make sure that the correct process is followed by the selecting official as well as the interviewers. And with the guidelines, well, first of all, the bigger problem for the plaintiff here is the GSA did everything right. They followed the guidelines to a T. In fact, as the district court put it, they scrupulously followed the guidelines in the first round interview. And the second round interview, they complied with what is known as the Gelber directive. And the main part about that directive is that the commissioner at the time, Bruce Gelber, wanted to have someone from his immediate staff involved in the interviews and the selection. And in this case, that was Ms. Acevedo. And they followed that directive. They conducted the interviews. They talked about the candidates. The selecting official, Mr. Green, said, I would like Ms. Woodstock for this position because her answers demonstrated a better knowledge of our challenges and had a plan to meet those challenges. And so he then passed that recommendation up to the regional commissioner who passed it up to the commissioner who then, with Ms. Acevedo's concurrence, he approved that recommendation. And so the other thing to keep in mind is there was not one interviewer that thought the plaintiff should get this job. Not one. All three interviewers thought that Ms. Woodstock was the most qualified. And the interview questions that they asked and the way they did the questions, they asked the exact same question by the exact same interviewer in the exact same order to each applicant. And they gave each applicant the same amount of time to answer those questions. No reasonable jury would find that process to be discriminatory. And you mentioned the guidelines. Even if they did apply, any deviation from them was applied equally across the board as to all the candidates such that there could be no inference of discrimination raised. And that's what this court found in both Coleman v. Donahue and Jahl v. Valparaiso Community Schools, both of which the district court correctly relied upon in this case. And we cite those in our brief. Is it correct that when Mr. Green draft prepared the questions for the second round, he didn't know who the candidates were going to be sitting for the interview? That's correct. And he had no opportunity to kind of tailor the questions to Ms. Woodstock versus Ms. Barnes-Staple? He didn't know who was going to be in the second round when he developed those questions. But if you look at the questions that they asked, they're exactly the question you would expect them to ask of someone who's the director. Things like, what are the challenges of the division and how would you meet them? That's a question that you would want to know if you're hiring somebody to run an agency. Now, it would be different here if, for example, they applied the guidelines in the second round to only the plaintiff but not the other candidates, or if they applied the guidelines to only the other candidates but not the plaintiff. But that's not what happened here. It was an across-the-board deviation, if there was a deviation, and there wasn't. Her complaints about the process are unsupported. She claims her qualifications weren't considered. Of course they were considered. They were considered in the answers she gave in the second round interviews. She complains about, you know, she had an MBA and the selectee didn't. That was not a requirement for the job. She didn't have an MBA for this job. She claims that the questions were tailored. No, they weren't. Again, if you take a look at the questions, the second question was a hypothetical. The commissioner has increased the leasing performance standards for the region by 50%. How would you address that challenge? Maybe that wasn't a hypothetical. Maybe that was an actual problem that the division was trying to figure out. The GSA has a right to pick the person that can solve their problems. And that's what this interview was all about. She claims that the interviewers lied in their depositions. They didn't lie. As the district court put it, the plaintiff boldly but inaccurately claims they lied. You know, they described the process in slightly different terms. But that's not lying. They all painted a consistent picture of what happened. The selecting official, Mr. Green, decided he wanted Ms. Whitstock and passed it on up to the commissioner. The bottom line here, though, is that the plaintiff simply presented insufficient evidence, actually no evidence, to demonstrate that the reasons for her non-selection were pretext for discrimination. As for her other claims, her intersectional discrimination claim and her retaliation claim, she failed to exhaust her administrative remedies for those. In fact, she didn't even address the exhaustion argument in the district court, nor did she address it here. And so, therefore, those arguments are waived. Her statistical evidence argument, too, was not raised in the district court either. She refers to a motion to compel, but of course the motion to compel was not part of the motion for summary judgment record. Unless the court has any further questions, we ask that you affirm the decision of the district court. Thank you. Ms. Major, your time has expired, but you may have an additional minute if you have anything to say in rebuttal. Sure, I'll talk very fast. All of the panel members who testified admitted that the procedure did apply at the second step. That's in the record. The panel admitted that the question was, that we say favored Ms. Woodstock, was something that she'd be able to answer and people outside would have difficulty with. The issue here isn't whether counsel believes Ms. Woodstock was more qualified or whether the lower court. The question is whether there's sufficient evidence here that calls into question whether this was a discriminatory process that prevented my client from being selected. And without having this process correct, we're never going to know how this would have turned out had they followed and done the right thing. Finally, we did address the intersectional discrimination repeatedly. It's the gender and the race and that's always been a part of her case and it was addressed in our briefs. And I thank you very much for your time and your consideration. Thank you very much. Thanks to all counsel. The case is taken under advisement and the court will be in recess.